THOMPSON, Presiding Judge.
The Water Works Board of the City of Birmingham (“the Board”) appeals from the judgment of the Jefferson Circuit Court awarding Allan Isom permanent-partial-disability benefits pursuant to the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975 (“the Act”).[1] For the reasons set forth herein, we affirm.
Isom began working for the Board in 1990. On June 16, 2003, he was injured in an on-the-job accident (“the 2003 injury”). As a result of that accident, Isom filed an action against the Board pursuant to the Act. That action concluded in a settlement agreement between the parties that provided for a lump-sum payment to Isom of $18,480, with the Board’s obligation to pay for Isom’s future medical benefits remaining open. As part of its judgment based on the parties’ settlement, the trial court assigned Isom a 10% permanent whole-body disability rating.
On July 3, 2008, Isom filed an action against the Board in which he asserted that he had been injured again on July 4, 2006, as a result of another on-the-job accident (“the 2006 injury”). He sought relief against the Board pursuant to the Act. The Board filed an answer to the complaint in which it denied that Isom had been injured in an accident on July 4, 2006. The Board asserted, among other things, that the injury of which Isom was complaining was a continuation of the 2003 injury and that Isom’s recovery was limited to compensation for the degree of injury that would have resulted from the 2006 injury if the 2003 injury had not occurred.
*661 On August 26, 2009, the trial court held a bench trial of the action. Isom testified that he began working for the Board in 1990 and that he was promoted to his present position of supervisor in 2002. His duties as a supervisor included operating water valves, locating water leaks, and directing crews that worked in the field.
Isom testified that the 2003 injury stemmed from an automobile accident in which he injured his left shoulder and neck. Isom testified that he had two surgeries on his left shoulder and underwent physical therapy as a result of the 2003 injury. He testified that, after the second surgery, he was released to return to work without restrictions and that he had worked several months before the 2006 injury without seeing a doctor regarding his shoulder. He testified that, during that time, he had no problems with his shoulder and that he could do anything he wanted to do with it with regard to his job. He testified that he felt as though he had recovered and healed from the 2003 injury after the second surgery related to that injury.
At trial, Isom introduced medical records relating to the 2003 injury. The report from a surgery that Dr. David Adki-son performed on Isom’s left shoulder on August 28, 2003, indicated that Isom had been diagnosed with a left-shoulder superi- or labral tear and subacromial impingement. The surgery revealed, among other things, a “very large type II labral tear extending into the origin of the MGHL and involving the entire biceps anchor.”
The medical records indicated that Dr. Daniel Michael began treating Isom in April 2004. A medical record from Isom’s April 26, 2004, appointment with Dr. Michael indicated that Isom was experiencing continued pain in his left shoulder and neck, occasionally radiating to his elbow. Dr. Michael ordered an MRI of Isom’s neck. The MRI revealed some degeneration of Isom’s cervical spine.
A medical note from Isom’s May 5, 2004, visit with Dr. Michael indicated that Dr. Michael decided to treat Isom’s neck pain with an epidural block. A medical note dated June 2, 2004, indicated that Isom obtained significant relief for a few days from his neck pain from the epidural block. A medical note from July 14, 2004, indicated that Isom’s neck pain had virtually resolved but that he was continuing to experience pain in his left shoulder with an increasing popping in the shoulder. Dr. Michael ordered an MRI for Isom’s shoulder to determine whether his shoulder was having difficulty healing from the August 2003 surgery or whether there was some other problem with his rotator cuff that had been previously overlooked. That MRI revealed no evidence of a tear in the rotator cuff or any injury to the labrum. Dr. Michael ordered an epidural block for Isom’s left shoulder, which reduced Isom’s pain.
A medical record from December 20, 2004, indicated that Isom was experiencing stiffness and irritation in his shoulder. A physical examination revealed that he might have been experiencing some recurring tendinitis or bursitis. He was given another epidural block. A medical record from January 3, 2005, indicated that he was continuing to experience pain in his left shoulder and that Dr. Michael determined that he should undergo a second surgery on his shoulder to remove scar tissue from the previous surgery that could have been causing Isom’s shoulder difficulty.
On January 21, 2005, Dr. Michael performed a second surgery on Isom’s left shoulder. It was determined during that surgery that the labrum had not reattached to the glenoid, and corrective procedures were performed to cause that *662 reattachment. A medical note from April 6, 2005, indicated that Isom’s shoulder was better except for some occasional soreness when he crossed his arm over his chest. A medical note from May 4, 2005, indicated that “[t]he only time [Isom] has trouble with the shoulder is when he over does it.” Dr. Michael indicated that the second surgery had been successful. He assigned Isom a medical-impairment rating of 10% to the body as a whole and indicated that Isom’s activities were unrestricted. . A medical record from August 10, 2005, indicated that Isom was released from all work restrictions as of that day. A medical record from October 12, 2005, indicated that Isom’s left shoulder was not bothering him very much and that Isom would follow up with Dr. Michael on an as-needed basis.
Isom testified that, on July 4, 2006, the day of his injury made the basis of the present action, the Board was closed. Isom testified that he was on call that day, and he was called in to work because of multiple broken water mains. He stated that, at the time he was injured that day, he was operating a 12-inch water valve with another Board employee. He testified that the valve was difficult to operate because it was old, having been installed before 1921. He testified that, as he and the other employee were pulling the valve, he felt a tearing pain in his left shoulder that went to his left elbow. He stated that he also experienced pain in his neck.
Isom testified that he called Bruce Adams, his supervisor, the next day and told him that he had hurt his shoulder and how he had done so. Isom testified that this was the appropriate procedure for reporting a workplace injury, although he admitted that he did not inform Adams that the injury to his shoulder was a new one. Isom stated that Adams told him to call Herb Allen, the Board’s safety officer, and inform Allen about the injury. Isom testified that Allen directed him to contact Dr. Michael, the second doctor who had treated Isom for the 2003 injury.
A medical record dated July 12, 2006, indicated that Isom returned to Dr. Michael complaining of soreness in his left shoulder. Dr. Michael gave Isom a steroid shot in the shoulder and restricted him from heavy lifting and strenuous activity with his left arm and left shoulder. A medical record from August 7, 2006, indicated that Isom was continuing to experience pain and that Dr. Michael ordered another steroid shot. A medical record dated September 20, 2006, indicated that Isom was continuing to experience pain in his left shoulder. The record states:
“Up until he turned the large valve earlier this year he stated that his shoulder had gotten completely well and he was basically doing everything that he wanted to. Since it is not responding and he is acting the same way he did before we did his last surgery I would be worried that the labral repair might have been disrupted.”
The note also related that Isom was developing cubital tunnel symptoms in his left elbow. Dr. Michael ordered an MRI of Isom’s shoulder. The MRI revealed that the “rotator cuff tendon repair appeared] to be intact with no evidence of recurrence.”
On November 10, 2006, Dr. Michael performed another surgery on Isom’s left shoulder. Based on the surgery, Dr. Michael noted that Isom had a “SLAP” lesion at the insertion of the biceps tendon and that he had an anterior labral tear. He wrote: “[Isom] previously had a labral repair several years ago and with a recent injury this apparently retore that repair.” A medical note from January 24, 2007, indicated that Isom’s left shoulder was progressively improving but that he was experiencing pain in his neck. Dr. Michael *663 ordered a cervical epidural block for Isom’s neck pain. A medical note from March 21, 2007, indicated that Isom was continuing to experience neck pain, and Dr. Michael ordered another epidural block for Isom’s neck, as well as treatment for his left elbow.
The medical records indicate that Dr. Thomas Powell began treating Isom in June 2007 and that Isom was continuing to have pain in his left shoulder and neck at that time. A medical note dated September 10, 2007, indicated that Dr. Powell believed Isom to be at maximum medical improvement, and he ordered an impairment rating. Upon evaluation, Isom was assigned a 10% impairment of the left upper extremity and a 6% impairment of the whole person. A medical note from Isom’s October 23, 2007, appointment with Dr. Powell indicated that Dr. Powell agreed with those impairment ratings. The note indicated that Isom was able to return to work and that Dr. Powell would see Isom on an as-needed basis. He prescribed pain medication for Isom.
Isom testified that, after his last visit with Dr. Powell in October 2007, Dr. Powell released him to return to full-duty work without restrictions. He testified that he had not received treatment for his left shoulder, left elbow, and neck from any other doctors since his last visit with Dr. Powell. Isom testified that he had not had any problems with his left elbow before the 2006 injury but that, since that injury, he has continued to have problems with it. He testified that he had ongoing problems with his left arm and his neck as well. He testified that, before the 2006 injury, he did not have those problems. However, on cross-examination, Isom admitted that he had experienced ongoing pain in his neck since the 2003 injury, for which he took a narcotic pain medication until the last time he saw Dr. Michael in October 2005. Isom testified that, because of the problems with his neck and his left shoulder, he had difficulty sleeping at night and doing particular activities, such as cutting the grass or changing a flat tire.
Herb Allen, the Board’s safety officer, testified that, under the circumstances, Isom’s reporting-of the 2006 injury to his supervisor was the correct procedure for Isom to follow to report his injury. Allen testified that he did not recall being informed before October 24, 2006, that Isom had sustained a new shoulder injury, and he stated that he did not recall Isom contacting him on July 5, 2006, regarding the 2006 injury. Allen testified that he found Isom, with whom he had worked for the preceding 18 years, to be honest, to be a hard worker, and to be a dependable employee.
The Board offered into evidence the deposition of Dr. Powell. In his deposition, Dr. Powell testified that he could not state to any degree of medical certainty whether the labral tear was related to the 2003 injury or to the 2006 injury because he did not begin treating Isom until after Isom had had the November 2006 surgery. He stated that if Isom had “had an acute symptomatic tear, whether it was a retear or not,” he would think that it “would be related to an event that had just occurred.” Dr. Powell testified that the 2006 injury “appear[ed] to be a new injury” and that, based on Dr. Michael’s records and assuming those records were correct, it appeared that what he was treating Isom for was caused or contributed to by the July 4, 2006, accident.
A letter from Dr. Michael to Isom’s counsel dated April 28, 2009, was made an exhibit to Dr. Powell’s deposition. In that letter, Dr. Michael wrote, in pertinent part:
“It appears that between [Isom’s] last two surgeries, there was a period of *664 time where he was symptom-free in regard to the left shoulder. It appears that he was back [to] full duty with no restrictions and no limitations in regards to having had the two procedures done, one by Dr. Adkison and the other by me. On or around July 4, 2006, there appeared to be a new injury while turning a large valve. This injury subsequently led to further surgery on the same shoulder where there was injury to the area where he had the previous two surgeries. In reviewing the records, it is my opinion that the incident on or around July 4, 2006, was a new injury even though [it] was in the same area where he had some surgical repair of a torn labrum with that period of time where he was symptom-free. I feel [that] his injury had healed and the injury in July 2006 created a new injury to the old area of the shoulder.”
On December 17, 2009, the trial court entered a final judgment. The trial court found that Isom “was performing his duties at the time of this traumatic injury,” that the injury arose out of his employment with the Board, and that the Board had been given timely notice of the injury. The trial court found that, as a result of the injury to his left shoulder, left elbow, and neck, Isom had suffered a loss of at least 12.5% of the use of his left arm and that he was due to be awarded benefits pursuant to the Act. The trial court awarded Isom $9,459.48 as accrued permanent-partial-disability payments. The trial court awarded Isom weekly permanent-partial-disability payments of $92.74 for the next 190 weeks. The trial court taxed the costs of the action to the Board, and it ordered the Board to be responsible for future medical treatment for Isom’s left shoulder, left elbow, and neck. On December 21, 2009, the trial court amended the amount of costs taxed to the Board. The Board appeals.
Section 25-5-81(e), Ala.Code 1975, provides the standard by which this court reviews appeals in cases arising under the Act. That section provides:
“(e) Review. From an order or judgment, any aggrieved party may, within 42 days thereafter, appeal to the Court of Civil Appeals and review shall be as in cases reviewed as follows:
“(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
Discussing this standard, this court wrote in Reeves Rubber, Inc. v. Wallace, 912 So.2d 274, 279 (Ala.Civ.App.2005):
“When this court reviews a trial court’s factual findings in a workers’ compensation case, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2), Ala.Code 1975. Substantial evidence is ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Further, this court reviews the facts ‘in the light most favorable to the findings of the trial court.’ Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala.1996). This court has also concluded: ‘The [1992 Workers’ Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court.’ Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, *665 1014 (Ala.Civ.App.1995). However, our review as to purely legal issues is without a presumption of correctness. See Holy Family Catholic School v. Boley, 847 So.2d 371, 374 (Ala.Civ.App.2002) (citing § 25-5-81(e)(1), Ala.Code 1975).”
The Board contends that Isom did not give it adequate notice of the 2006 injury. It argues that he merely indicated to his supervisors that he had hurt his left shoulder without actually relating the 2006 injury to a work-related incident. It argues that Isom did not provide written notice to it of the 2006 injury until October 24, 2006, the day after Dr. Michael determined that he had experienced another labral tear.
Section 25-5-78, Ala.Code 1975, provides:
“For purposes of this article only, an injured employee or the employee’s representative, within five days after the occurrence of an accident, shall give or cause to be given to the employer written notice of the accident. If the notice is not given, the employee or the employee’s dependent shall not be entitled to physician’s or medical fees nor any compensation which may have accrued under the terms of this article, unless it can be shown that the party required to give the notice had been prevented from doing so by reason of physical or mental incapacity, other than minority, fraud or deceit, or equal good reason. Notwithstanding any other provision of this section, no compensation shall be payable unless written notice is given within 90 days after the occurrence of the accident or, if death results, within 90 days after the death.”
Although § 25-5-78 speaks in terms of written notice, this court has written:
“The purpose of written notice is to advise the employer that the employee received a specified injury, in the course of his employment, at a specified time, and at a specified place, so that the employer may verify the injury by its own investigation. James v. Hornady Truck Line, Inc., 601 So.2d 1059 (Ala.Civ.App.1992). Written notice is not required where it is shown that the employer had actual notice of the injury. James. Oral notice is sufficient to give the employer actual notice. James. Like written notice, oral notice imparts to the employer the opportunity to investigate and protect itself against simulated and exaggerated claims. International Paper Co. v. Murray, 490 So.2d 1228 (Ala.Civ.App.), remanded on other grounds, 490 So.2d 1230 (Ala.1984). Even with oral notification, the employer must be notified that the employee was injured while in the scope of his employment. James. The fact that an employer is aware that the employee suffers from a malady or has medical problems is not, by itself, sufficient to charge the employer with actual notice. Russell Coal Co. v. Williams, 550 So.2d 1007 (Ala.Civ.App.1989). Knowledge on the part of a supervisory or representative agent of the employer that a work-related injury has occurred will generally be imputed to the employer. Beatrice Foods Co. v. Clemons, 54 Ala.App. 150, 306 So.2d 18 (Ala.Civ.App.1975).”
Wal-Mart Stores, Inc. v. Elliott, 650 So.2d 906, 908 (Ala.Civ.App.1994).
The Board argues that, in the present case, Isom told Bruce Adams, his supervisor, only that he had hurt his shoulder. We agree with the Board that, if that was all Isom had said to Adams, that information would have been insufficient to provide the Board with the knowledge that the injury causing the pain in Isom’s shoulder was related to his work for the Board. See Premdor Corp. v. Jones, 880 So.2d 1148, 1155 (Ala.Civ.App.2003) (worker’s *666 oral statement that she had hurt her back without indication of how she had hurt her back was not sufficient notice to employer that injury was work related). However, the testimony at trial indicated that Isom told Adams more than that he had hurt his shoulder; Isom testified that he had told Adams how he had hurt his shoulder. Both Isom and Herb Allen, the Board’s safety officer, indicated that Isom’s informing Adams of the 2006 injury was the proper procedure he was to follow to report his injury. In our view, Isom’s and Allen’s testimony was sufficient to support the trial court’s conclusion that Isom had provided adequate notice to the Board of the 2006 injury and sufficient information to apprise it that his injury was related to the work he was performing for the Board. As a result, we cannot agree that the Board demonstrated that Isom failed to provide adequate notice under the Act.
The Board also contends that the trial court erred when it awarded Isom permanent-partial-disability benefits under the Act based on the 2006 injury when the 6% whole-body impairment rating Dr. Powell assigned to Isom for the 2006 injury was less than the 10% whole-body impairment rating found by the trial court in the 2005 judgment it entered based on the 2008 injury. Relying on § 25-5-57(a)(4)e. and § 25-5-58, Ala.Code 1975, the Board argues that “the trial court erred in failing to apportion Isom’s disability between [the 2003 injury] and impairment and his alleged [2006 injury] and impairment” and that Isom was not entitled to any additional payments beyond those which he had received as a result of the 2003 injury because Isom had not experienced an increase in his impairment rating for the 2006 injury over the 2003 injury.
Section 25-5-57(a)(4)e. provides:
“If an employee has a permanent disability or has previously sustained another injury than that in which the employee received a subsequent permanent injury by accident, as is specified in this section defining permanent injury, the employee shall be entitled to compensation only for the degree of injury that would have resulted from the latter accident if the earlier disability or injury had not existed.”
Section 25-5-58 provides: “If the degree or duration of disability resulting from an accident is increased or prolonged because of a preexisting injury or infirmity, the employer shall be liable only for the disability that would have resulted from the accident had the earlier injury or infirmity not existed.”
In Francis Powell Enterprises, Inc. v. Andrews, 21 So.3d 726, 736 (Ala.Civ.App.2009), this court discussed the proper application of § 25-5-58, writing:
“Powell argues that because Andrews had a preexisting back injury with spondylolisthesis, his right to recover workers’ compensation benefits for the November 3, 2003, on-the-job injury is limited by § 25-5-58, Ala.Code 1975....
“In a long line of cases beginning with Ingalls Shipbuilding Corp. v. Cahela, 251 Ala. 163, 36 So.2d 513 (1948) (superseded on other grounds by statute, see Tit. 26, § 262(a), Ala.Code 1940), Alabama appellate courts have held that ‘ “the term ... infirmity in [§ 25-5-58] refer[s] to a condition which affects [the plaintiffs] ability to work as a normal man at the time of the accident or which would probably so affect him within the compensable period.” ’ Ex parte Lewis, 469 So.2d 599, 601 (Ala.1985) (quoting Cahela, 251 Ala. at 173, 36 So.2d at 521). Pursuant to Cahela,
“ ‘the law presumes that there is no preexisting injury or infirmity when the employee is able to fully perform *667 his or her job duties in a normal manner prior to the subject injury. [Section 25-5-58] only applies when the previous injury or infirmity has demonstrated itself as disabling and prevented the employee from earning wages in a normal manner.’
“1 Terry A. Moore, Alabama Workers’ Compensation § 16.25 at 708-09 (1998) (emphasis added; footnote omitted).”
We note that “[§] 25-5-57(a)(4)e. has been construed identically to § 25-5-58 so that if the employee is working normally at the time of the second accident, the law presumes the employee had no preexisting disability or injury.” Alamo v. PCH Hotels & Resorts, Inc., 987 So.2d 598, 604 n. 1 (Ala.Civ.App.2007) (citing Ex parte Bratton, 678 So.2d 1079, 1083 (Ala.1996)).
In the present case, Isom testified that, following the 2003 injury and his recovery therefrom, he was able to return to work and perform his job fully without any restrictions for a period of several months before the 2006 injury. He testified that, during that period, he experienced no problems with his left shoulder and that he could do anything he wanted ■with regard to his job. The medical records submitted at trial support Isom’s testimony in this regard. Because the 2003 injury neither demonstrated itself as disabling nor prevented Isom from earning wages in a normal manner, the trial court did not err in refusing to consider the effects of the 2003 injury on Isom’s impairment following the 2006 injury. The trial court’s judgment is due to be affirmed as to this issue.
Finally, relying on the “last-injurious-exposure rule,” the Board contends that Isom’s 2006 injury was merely a recurrence of his 2003 injury and that, because the Board had already compensated him for the 2003 injury, he was not entitled to any further compensation based on the 2006 injury. The Board points to medical notes indicating that the 2006 injury was a “retear” of the surgical repair on Isom’s glenoid labrum, which had been torn as a result of the 2003 injury. The Board also points out that Isom’s medical-impairment rating from the 2003 injury exceeded his medical-impairment rating from the 2006 injury. The Board concludes that “[t]he medical evidence undisputedly establishes that Isom sustained a recurrence of his [2003 injury], and, therefore, that Isom did not sustain a new injury entitling him to additional compensation for the same impairment of the same torn labrum that he sustained on June 13, 2003.”
Generally, the last-injurious-exposure rule is utilized by courts to determine which of multiple employers is liable for a subsequent injury sustained by a worker.
“Under the ‘last injurious exposure’ rule, ‘liability falls upon the carrier covering [the] risk at the time of the most recent injury bearing a causal relation to the disability.’ North River Insurance Co. v. Purser, 608 So.2d 1379, 1382 (Ala. Civ.App.1992). The trial court must determine whether the second injury is ‘a new injury, an aggravation of a prior injury, or a recurrence of an old injury; this determination resolves the issue of which insurer is liable.’ Id.
“A court finds a recurrence when ‘the second [injury] does not contribute even slightly to the causation of the [disability].’ 4 A. Larson, The Law of Workmen’s Compensation, § 95.23 at 17-142 (1989). ‘[T]his group also includes the kind of case in which a worker has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion.’ 4 A. Larson, § 95.23 at 17- *668 152. A court finds an ‘aggravation of an injury when the ‘second [injury] contributed independently to the final disability.’ 4 A. Larson, § 95.22 at 17-141. If the second injury is characterized as a recurrence of the first injury, then the first insurer is responsible for the medical bills; however, if the injury is considered an aggravation of the first injury, then it is considered a new injury and the employer at the time of the aggravating injury is liable for the medical bills and disability payments. North River, supra.”
United States Fid. & Guar. Co. v. Stepp, 642 So.2d 712, 715 (Ala.Civ.App.1994).
As noted above, in the April 28, 2009, letter from Dr. Michael to Isom’s counsel, Dr. Michael opined that the 2003 injury had completely healed before Isom sustained the 2006 injury and that the 2006 injury was a new injury.[2] Although Dr. Powell testified that he could not state to any degree of medical certainty whether Isom’s labral tear following the accident causing the 2006 injury was related to the 2003 injury or to the 2006 injury because he did not treat Isom until after the November 2006 surgery, Dr. Powell also testified that if Isom had “had an acute symptomatic tear, whether it was a retear or not,” he would think that it “would be related to an event that had just occurred” and that the 2006 injury “appear[ed] to be a new injury.” Dr. Powell also testified that, based on Dr. Michael’s records and assuming those records were correct, it appeared that what Dr. Michael was treating Isom for was caused or contributed to by the accident that he described as having occurred on July 4, 2006.[3]
Isom testified that, after the January 2005 surgery, he was released to return to work without restrictions and that he worked several months before the 2006 injury without seeing a doctor regarding his shoulder. He testified that, during that time, he had no problems with his shoulder and that he could do anything he *669 wanted to do with it with regard to his job, and he testified that he felt as though he had recovered and healed from the 2003 injury.
Dr. Michael’s medical records related to the treatment of Isom’s 2003 injury largely support Isom’s testimony. Those records indicated that, within three months of having performed the January 2005 surgery on Isom’s shoulder, Isom was experiencing only occasional soreness in his shoulder, that his shoulder pain had resolved or had virtually resolved within eight months of the January 2005 surgery, and that Dr. Michael believed that the January 2005 surgery had been successful. Additional medical records indicated that Dr. Michael released Isom from all work restrictions almost 11 months before the 2006 injury.
The evidence, considered in its totality, supports the trial court’s conclusion that the 2006 injury was compensable separately from the 2003 injury. The above-discussed evidence indicates that the labral tear in Isom’s left shoulder from the June 2003 accident had healed and that the July 4, 2006, accident caused a new labral tear in his left shoulder or, at the very least, resulted in a retearing of the previous labral tear, i.e., an aggravation of the previous tear. See Health-Tex, Inc. v. Humphrey, 747 So.2d 901, 905 (Ala.Civ.App. 1999) (finding that evidence “that [the worker] was not experiencing problems when she first started working for the second company, but that after a few months of performing her repetitive-motion sewing duties she began to experience pain and numbness characteristic of carpal tunnel syndrome,” and the worker’s treating physician’s testimony “that her work at the second company contributed to her subsequent carpal tunnel syndrome,” supported trial court’s conclusion that the worker’s subsequent injury was an aggravation of her prior injury rather than a recurrence of it). See also 1 Terry A. Moore, Alabama Workers’ Compensation § 6:19 (1998 & 2009 Supp.) (“A new injury is a harmful change in the condition of the employee that is different and independent of the original compensable injury, even if located near or on the site of the original compensable injury.”); id. at § 6:20 (“An aggravation occurs when, after the employee has resumed working normally without continuing symptoms, a subsequent work-related factor independently worsens the original compensable injury.”). As a result, we find no merit in the Board’s contention that the evidence supported only a finding that the 2006 injury was a mere recurrence of the 2003 injury, and, in this regard, the trial court’s judgment is due to be affirmed.
Based on the foregoing, we conclude that the trial court’s judgment is supported by substantial evidence and that the Board has failed to demonstrate a basis on which to hold the trial court in error. Accordingly, we affirm the trial court’s judgment.
AFFIRMED.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.

. Neither party contends that the Act does not apply in this case on the basis that the Board is an agency of a municipality that is exempted from the Act by virtue of § 25-5-13(b), Ala.Code 1975, and the record does not reflect that that exemption is applicable to the Board.

. During Dr. Powell's deposition, the Board objected to, and moved to strike, Dr. Michael's letter. When the letter appeared on Isom's pretrial list of exhibits, the Board filed an objection to the letter. Isom did not offer the letter as an exhibit at trial. However, at the end of the trial, the Board offered Dr. Powell's deposition into evidence and did not move, pursuant to Rule 32(b), Ala. R. Civ. P., to strike Dr. Michael's letter as an exhibit to the deposition. Having failed to make such a motion and obtain a ruling thereon from the trial court, the letter became a part of the record that the trial court was free to consider. See Glenn v. Vulcan Materials Co., 534 So.2d 598, 601-02 (Ala.1988), overruled, on other grounds, Lowman v. Piedmont Exec. Shirt Mfg. Co., 547 So.2d 90, 95 (Ala.1989). Cf. Bryant v. State Farm Fire & Cas. Ins. Co., 447 So.2d 181, 184 (Ala.1984) ("In conclusion, we add that in the absence of a motion to strike or exclude the witness's answer and a ruling by the trial court on the motion, there is nothing for this Court to review.”).
In apparent recognition of its oversight in failing to move the trial court to strike Dr. Michael’s letter as an exhibit to the deposition that it offered to the court, the Board moves this court to strike the letter as an exhibit to the deposition of Dr. Powell. For reasons requiring no citation to law, such a request is wholly improper at the appellate-court level. Even if we were not to consider the letter on appeal, however, we conclude that the other evidence of record, discussed herein, supports the trial court’s determination that the 2006 injury is not a recurrence of the 2003 injury but, instead, is a new injury or an aggravation of the 2003 injury.

. The Board also moves this court to strike the portion of Dr. Powell’s deposition testimony that was based on Dr. Michael’s medical records and opinions. However, the Board, which offered Dr. Powell’s deposition into evidence, did not move to strike that portion of Dr. Powell's testimony in the trial court, and, as a result, the Board will not be heard to argue on appeal that the trial court's judgment cannot be supported by that testimony. See supra note 2.